## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeffrey Balow, | No. 23-cv-843 (KMM/ECW) |
| Plaintiff, | |
| v. | **ORDER** |
| Medtronic USA, Inc., | |
| Defendant. | |

Plaintiff Jeffrey Balow alleges that his former employer, Defendant Medtronic USA, Inc., engaged in unlawful discrimination and retaliation when it adjusted the commissions he was eligible to receive and later terminated his employment as a sales representative. The matter is before the Court on Medtronic's motion for summary judgment. For the reasons that follow, Medtronic's motion is granted, and this action is dismissed.

## BACKGROUND

Mr. Balow asserts claims for age and sex discrimination under the Virginia Human Rights Act ("VHRA"), Va. Cod Ann. § 2.2-3900 *et seq.*, and for unlawful retaliation in violation of the Virginia Whistleblower Protection Act ("VWPA"), Va. Code Ann. § 40.1-27.3. His discrimination claims arise out of Medtronic's hiring and promotion of a younger, female sales representative, which led to a reduction in the commissions he could earn in the territory he covered. And his retaliation claims concern Medtronic's alleged decisions to place him on a final warning because he lodged a complaint about the other sales

representative's conduct and to terminate his employment because he filed a charge of discrimination with the Virginia Office of Civil Rights, filed this lawsuit, and litigated this case.

## I.    Balow's Employment with Medtronic

Mr. Balow began working for Medtronic in April 2012 as a sales representative with the title Interventional Therapy Consultant 2 ("ITC2"). As an ITC2, Balow covered a territory including Washington, DC, and the surrounding area—the Northeast region of Medtronic's Neuromodulation business. Hahn Decl., Ex. 1, Balow Dep. 30:7–23; Fitzke Decl., Ex. 13.[1] ITC2 sales representatives provide technical support and are a resource that physicians can turn to when they use Medtronic products during surgical procedures. Mr. Balow sold equipment for kyphoplasty and vertebroplasty procedures. During his tenure with Medtronic, Balow successfully contributed to the growth of the business in his territory, earning him recognition within the company. Balow Dep. 44:1–4, 63:14–24. This included being distinguished with an exclusive "President's Club" honor available for high-performing sales personnel.

Throughout his employment, Mr. Balow received a substantial portion of his compensation in commissions. This is distinct from the compensation structure for sales representatives who work in a developmental role under the title Interventional Therapy Consultant 1 ("ITC1"). While ITC2s have a lower base salary, they have greater

---

[1] Deposition transcripts are attached to declarations filed by both parties to this case, some of which contain only excerpts, and others a complete copy. For example, Mr. Balow's entire deposition is found in Exhibit 1 to Plaintiff's counsel's declaration, and excerpts of the same are found in Exhibit 13 to Defense counsel's declaration.

opportunities to earn commissions. Those working as ITC1s receive a higher base salary, but do not have the same chances to earn commissions as ITC2s.

Medtronic occasionally made personnel changes that affected how many ITC2 sales reps covered the Northeast region of its Neuromodulation business, and it adjusted the commissions available to the ITC2s working in the territory. For example, in May 2022, Medtronic split a territory within the Northeast region between two other ITC2s, K.M. and K.J., which allowed K.M. to earn more than 50 percent of the commissions. This development occurred even though K.J. had previously handled that territory herself. Similarly, in February 2023, in another territory, Medtronic adjusted the allotment of commissions between two ITC2 sales reps from a 60-40 split to a 50-50 arrangement. Hagel Decl. ¶¶ 26–27. Mr. Balow acknowledged that it "was not uncommon to see a commission split adjusted." Balow Dep. 60:22–61:1.

Such adjustments to territory coverage and commission allotments affected Mr. Balow as well. When he started with Medtronic, Mr. Balow worked alongside two other ITC2 sales reps within his territory, and the three split commissions evenly. Eventually, Medtronic hired another ITC2 for the territory and divided the coverage of the territory and allotment of commissions evenly between all four ITC2s. Under this arrangement, Mr. Balow and another ITC2 split half of the territory and the available commissions, while the other two ITC2s covered the other half of the territory and split the commissions available there. In 2013, Medtronic adjusted coverage for the territory again, reducing the number of sales representatives responsible for the entire region down to Mr. Balow and another ITC2. That arrangement lasted several years until, in early 2018,

Mr. Balow's colleague resigned, leaving Balow as the sole ITC2 covering the territory for several months. During that time, Balow covered all of Medtronic's accounts in the area, which also gave him an opportunity to earn greater commissions. However, this staffing arrangement limited Medtronic's ability to cover surgeries and accounts throughout the region.

In 2018, Mr. Balow's direct supervisor, Krista Harrison, told Balow that the company planned to hire an ITC1 to work in the territory. According to Mr. Balow, Harrison told him that the accounts in the territory (and the corresponding commissions) that he had developed would remain solely his, and Medtronic would bring on the new ITC1 to assist him.

## II.    Hiring Angela Pan and Adjusting Commissions

In August 2018, Medtronic hired Angela Pan to work as an ITC1 to cover the same territory as Mr. Balow. Ms. Pan's hiring precipitated the events that led to this lawsuit. Ms. Pan, a female who was in her early 30s when Medtronic hired her, took the ITC1 position as her first sales job. Mr. Balow described their relationship as difficult, but the two were nevertheless successful in making sales and growing Medtronic's business within the territory.

When Medtronic hired Pan, she and Balow split the allocation of commissions within the territory. Mr. Balow received 86 percent and Ms. Pan 14 percent. In January 2022, Medtronic promoted Pan to ITC2 and changed the commission split between her and Mr. Balow. Under this new arrangement, Balow received 70 percent of the allotted commissions, and Pan received 30 percent. Hahn Decl., Ex. K at 2.

4

However, Mr. Balow thought Ms. Pan didn't deserve the promotion, which he shared with his direct supervisor, Matt Amberg, during Balow's January 2022 performance review. Balow Dep. 82:21–24, 93:10–94:9, 96:6–12. According to Mr. Balow, Mr. Amberg said that a more senior manager, Radena Salmon, had made the decision to promote Ms. Pan. *Id.* 100:7–13. Amberg told Balow that he was also surprised at Pan's promotion, but unlike Balow, Amberg thought Pan deserved to be promoted. *Id.* 99:5–19.

Amberg also made statements to Mr. Balow during the January 2022 performance review that alluded to Balow's age. Mr. Balow is in his 50s. When the meeting started, Mr. Amberg asked Balow how long he planned to continue working as a sales representative at Medtronic. Balow said he planned to be there until he retired, which he had no plans of doing at the time. *Id.* 94:10–95:1. Mr. Amberg also asked Mr. Balow how well Balow's wife's business as a realtor was going, and Amberg made a comment that Balow was "on the back nine of [his] career." *Id.* 95:2–96:19.

Ms. Pan's performance continued to contribute to strong sales in the territory following her promotion in January 2022. Mr. Amberg eventually concluded that an even split of the territory and its commissions between Balow and Pan would be most beneficial to Medtronic. Medtronic officially split the territory and commissions 50-50 between Balow and Pan on April 30, 2022. Hahn Decl., Ex. K at 2.

### III.    Balow Submits a Complaint and Medtronic Investigates

Before Medtronic made the decision to split the commissions evenly between Mr. Balow and Ms. Pan, Balow says that he learned that Ms. Pan may have been helping physicians before and during kyphoplasty procedures in the sterile operating environment.

Providing such assistance violates Medtronic policies prohibiting sales representatives from providing direct case support in the operating room. Ms. Pan had reportedly mixed a powdered cement that is used in the surgical procedures.

According to Mr. Balow, in the fall of 2021, he reported Pan's alleged actions to Ms. Harrison. Balow Dep. 90:15–20. However, Harrison was no longer Balow's supervisor at that time, and Balow says that she told him he should report his concerns to his manager, Mr. Amberg. *Id.* 90:21–22. Balow did not report Pan's alleged conduct to Amberg or anyone else at that time. *Id.* 91:3–14. Balow says that he heard from another Medtronic employee, Victor Watkins, that Ms. Harrison shared Balow's report of Pan's conduct with Mr. Amberg before Harrison left the company. *Id.* 91:12–92:3.

On May 16, 2022, just over two weeks after Medtronic made the decision to split the commissions between Mr. Balow and Ms. Pan evenly, Balow made a written report about Ms. Pan's alleged violations of Medtronic policy. Hahn Decl., Ex. B. Balow sent a letter to Carol Surface, Medtronic's Chief Human Resources Officer (the "Surface Letter"), making three complaints about Ms. Pan's actions. Fitzke Decl., Ex. 14. First, Mr. Balow shared his concerns that Pan had provided prohibited sterile assistance before and during surgical procedures.

> While I never observed this practice directly, I believe that in providing products and support for [one account], Ms. Pan has and continues to provide inappropriate pre and inter procedural "sterile" scrub case assistance in direct violation of longstanding Medtronic policy. The basis for my conclusion comes from several conversation with . . . physicians during the past year, including a direct "closed door" conversation with Dr. Kendal where we discussed the support he could expect from me as a Medtronic

> Representative in his cases. I let Dr. K[] know that I would **never** handle Medtronic equipment in a sterile environment prior to or during any procedures. The question from Dr. K[] and other doctors from this practice was consistent – *why do I insist on adhering to Medtronic policy when my co-worker, Ms. Pan is willing to disregard this policy?*

Surface Letter 2 (emphasis in original). Mr. Balow stated that another physician took issue with Balow's insistence on following Medtronic policy. The doctor allegedly told Balow: "*If you don't do what the other woman* **[Ms. Pan]** *that comes here does then I won't use Medtronic anymore*." *Id.* (emphasis in original).

Second, Mr. Balow asserted that the 50-50 territory split was "unfair," explaining that he had not been provided any notice that Ms. Pan would be promoted and that it would significantly reduce the commissions he could expect to earn. Third, Mr. Balow stated that Pan had unnecessarily shipped two products to a customer that were not needed so her sales numbers would be more favorable at the end of the year and she would have a chance to receive the President's Club honor. Mr. Balow reiterated these complaints during a phone call with a Senior Employee Relations Program Manager on May 23, 2022. Hagel Decl. ¶ 8.

In response to the Surface Letter, Medtronic initiated two investigations into Mr. Balow's allegations. One investigation focused on Mr. Balow's assertion that the division of the territory and commissions between him and Pan was unfair. That investigation involved interviews of Mr. Balow, Ms. Pan, and other Medtronic personnel. Hagel Decl., Ex. 5. Ultimately, Medtronic determined that Balow's allegation of unfairness was unsupported. *Id.*, Ex. 5 at 4, 7. "The investigation findings with respect to the

commission adjustments and territory split were founded on Medtronic's past practice of splitting commission in shared territories and dividing territories among sales representatives for the purpose of maximizing sales coverage, incentivizing and recognizing the contribution of sales representatives, and to grow business." Hagel Decl. ¶ 14. Medtronic had "no record that Mr. Balow's age or gender were raised during the investigation into Balow's May 16 and May 23 complaints." *Id.* ¶ 15.

The other investigation concerned the allegations that Pan had violated Medtronic policies by doing sterile case-assistance work and making unauthorized product shipments. Fred Bragg, Medtronic's Senior Investigator of Global Compliance, conducted that investigation. Bragg conducted several employee interviews and reviewed relevant documents. Bragg completed the report summarizing his investigation on September 27, 2022. Hahn Decl., Ex. I. Following his investigation, Bragg determined that he was unable to prove that Pan engaged in the type of sterile case assistance Balow had discussed in the Surface Letter. Fitzke Decl., Ex. 23, Bragg Dep. 94:15–95:5. But Bragg felt there was circumstantial evidence supporting the accusation, including (1) Mr. Balow's statements about his discussions with two physicians, and (2) a report from a representative who covered a case for Ms. Pan, which indicated that the physician performing the procedure expected the other representative to provide improper case support. Bragg Dep. 74:6–75:25, 98:3–15.

Although he didn't find the complaint about improper case support sufficiently substantiated, Bragg found that the complaint about Pan's submission of unauthorized product orders was. Hagel Decl., Ex. 10 at 5. Eventually, because Medtronic determined

that Pan placed an unauthorized customer order, the company terminated her employment on November 1, 2022. Fitzke Decl., Ex. 21, McLeod Dep. 232:19–233:9; *id.*, Ex. 22, Hagel Dep. 155:21–24; Hahn Decl., Ex. M. John McLeod, Medtronic's Vice President of U.S. Sales for its Pain Interventions business, made the decision to terminate Ms. Pan. McLeod Dep. 232:18–21.[2]

Mr. Balow asserts that the investigations of his complaint were flawed in various ways. For example, he thought Bragg should have interviewed the physicians to whom Ms. Pan allegedly provided improper case assistance. Bragg Dep. 71:10–73:14, 79:11–17, 93:13–15. Mr. Bragg explained that Medtronic's general practice is that investigators like him do not communicate with doctors, but Bragg did not explain the reason for this practice and indicated that it was an undocumented "rule of thumb." *Id.* Further, although Bragg ultimately determined that the allegations of improper case assistance were unsubstantiated due to insufficient evidence, a draft report Bragg prepared suggested the opposite. Hahn Decl., Ex. J. Finally, Mr. Bragg did not specify what standard of proof he used to determine whether the allegations were substantiated; rather, Bragg explained that it was "somewhere north of" 51 percent, but less than beyond a reasonable doubt. Bragg Dep. 95:6–17.

## IV.    Pan Submits a Complaint and Medtronic Investigates

Before July 2022, Ms. Pan made no complaints about Mr. Balow, but in a conversation with Mr. Amberg on July 20, 2022, she raised several concerns about Balow's conduct. Hahn Decl., Ex. D. On August 7, 2022, while the company was still investigating

---

[2] After Medtronic fired Pan, it hired Lauren Ndoka as an ITC2 to replace Pan. Ms. Ndoka factors into the events that ultimately led to Mr. Balow's own termination.

Balow's complaint about Pan, she filed an official complaint with Medtronic about Balow. Hagel Decl., Ex. 7. Pan accused Balow of sending her inappropriate text messages in which he implied that customers wanted to work with her because she was a female and due to her appearance. She also complained that (1) Balow was taking excessive paid time off, causing her to shoulder too much of the territory's workload; (2) customers were frustrated with Balow's lack of availability; (3) Balow was not fulfilling his administrative duties and asked Pan to take care of them for him; (4) Balow improperly held certain stocks; (5) some doctors would not work with Balow, making it difficult for Medtronic to cover certain cases; and (6) on one occasion, Balow had smelled of marijuana when he picked up a product at Pan's home.

Medtronic investigated Ms. Pan's complaints about Mr. Balow's behavior and job performance, including interviewing personnel and reviewing Balow's text messages. Hagel Decl. ¶¶ 17–18 & Ex. 8. Balow believed Pan lodged her complaint in retaliation for his earlier report about her behavior, and he claims that Medtronic ultimately disciplined him for retaliatory reasons.

A Medtronic employee, Lisa Jones, investigated Pan's complaints. Jones interviewed Mr. Amberg, Ms. Pan, and Mr. Balow and provided summaries of those interviews. Amberg said that Pan had been very upset about the concerns Balow had raised in the Surface Letter, and she felt like she was being punished. Hahn Decl., Ex. D at 3. Amberg gave positive reviews of Pan's job performance and suggested that Balow's motivation for complaining about Pan's conduct was "money," and that he was "reaching for a lawsuit." *Id.* at 4. Jones asked Amberg if the territory would survive if the company

"lost [Balow] today," and Amberg said that if he was successful in his efforts to hire an experienced competitive sales representative he was actively recruiting at the time, Medtronic could afford to lose both Balow and Pan. *Id.* Ms. Jones also noted how, during her interview of Mr. Balow, he repeatedly stated that Ms. Pan's allegations against him were retaliatory. Hagel Decl., Ex. 8 at 10; Hahn Decl., Ex. D at 6, 9, 12, 17.

Ms. Jones reviewed text messages between Balow and Pan. In one exchange, Balow asked Pan if a physician performing a surgery was "in a good mood?" When Pan said "Yes," Balow wrote:

> Balow - Has he asked you out yet?
> Pan – Omg Jeff/We're done now!
> Balow – LOLOL. Did all go well?

Hagel Decl., Ex. 9 at 3. He also told Pan that the same physician "will be excited to see you [laughing emoji]." *Id.* at 6. In yet another message regarding that physician, Balow said "He's probably going through withdrawal [laughing emoji]" at Pan's absence. *Id.* at 4. In another text, Balow told Pan that a different physician was "really upset you didn't come [laughing emoji]" to which Pan responded "Oh lord/Hope he didn't sacrifice a goat in my honor." *Id.* at 2. Another example involved Balow asking Pan how a physician was, and after Pan said he was "in great spirits," Balow said "You made him happy [smiling emoji]." *Id.* at 5.

Ms. Jones ultimately determined that Balow "made inappropriate comments to Pan in text messages. In addition to the nature of the comments, Balow's texts insinuated that physicians were working with Pan because they found her attractive." Hagel Decl., Ex. 10 at 7; *id.*, Ex. 8 at 6; *id.*, Ex. 9. Medtronic also determined that Balow had pushed some of

his workload onto Ms. Pan and had been excluded from certain accounts by physicians who requested not to work with him. *Id.*, Ex. 10 at 7. However, the investigation also found that the majority of Pan's complaints about Mr. Balow were unsubstantiated.

On November 16, 2022, based on Jones' investigation, Medtronic issued Balow a "Final Written Warning" informing him that any future violations of the code of conduct could lead to termination. Fitzke Decl., Ex. 16. The final warning memo identified specific text messages that the company found violated its code of conduct and noted the circumstances that the company found that Mr. Balow had unfairly pushed workload onto Ms. Pan. *Id.*; Second Fitzke Decl., Ex. 25.

The decision to place Mr. Balow on a final warning followed a disciplinary action review (DAR) team meeting where Mr. McLeod and others considered the appropriate discipline for both Ms. Pan and Mr. Balow Mr. McLeod ultimately made the decision to issue the final warning to Mr. Balow. McLeod Decl. ¶ 9. Later, when asked whether the possibility that Pan's complaints had been retaliatory had come up at the DAR meeting, Mr. McLeod said that the "objective was to look at each incident and the findings discretely when determining their disciplinary action, and so [he did not] believe" that the group specifically considered whether Pan had a retaliatory motive. McLeod Dep. 116:19–25.

A few months after he received the final warning, Mr. Balow filed this proceeding in Hennepin County District Court, and Medtronic removed it to federal court on April 4,

2023.[3] After he filed his complaint, Balow filed a Charge of Discrimination with the Virginia Attorney General on July 6, 2023.[4] Fitzke Decl., Ex. 15. Mr. Balow's Charge asserted both age and sex discrimination claims and stated that on May 2, 2022, Medtronic informed him that it was reducing his territory and compensation as a result of the 50-50 commission split with Pan. *Id.* (Balow0000120). His complaint also alleged the final written warning constituted unlawful retaliation under the VWPA.

## V.    The Balloon Rupturing Incident

Medtronic ultimately terminated Balow's employment on August 2, 2023, several months after he filed this case. Medtronic determined that between March and July 2023, Mr. Balow repeatedly ignored a customer's concern about a potential product defect and failed to follow the company's mandatory defect-reporting policy. The policy at issue is Medtronic's Complaint Handling Procedure ("CHP"), which requires any employee who becomes aware of a product defect, malfunction, or adverse event to submit a written report called an "mPXR" within 48 hours. Hahn Decl., Ex. T.

Mr. Balow was unable to attend a kyphoplasty procedure on March 30, 2023. Lauren Ndoka, the ITC2 sales representative who replaced Pan, agreed to cover it. But Ndoka was subject to a non-compete agreement with her former employer, a Medtronic

---

[3] Balow's original complaint alleged violations of the VHRA and VWPA in addition to violations of the Minnesota Human Rights Act and the Minnesota Whistleblower Act. On Medtronic's motion for judgment on the pleadings, the Court dismissed the Minnesota statutory claims.

[4] This date is relevant to one summary-judgment issue raised by Medtronic—that Balow allegedly failed to properly exhaust his administrative remedies for his VHRA age and sex discrimination claims because he did not file his Charge until more than 300 days after the alleged unlawful employment practice.

competitor. As a result, she had to leave the procedure after the first phase was completed. During the second phase of the procedure, when neither Ndoka nor Balow were at the hospital, the physician used a Medtronic product that includes a very small balloon. The balloon ruptured, and the doctor performing the operation was unable to fully retrieve the balloon from the patient. Mr. Balow received a call from the physician performing the second phase of the surgery, but the call was not about the ruptured balloon. Fitzke Decl., Ex. 11. The physician was upset that there was no Medtronic representative at the procedure, and he asked Mr. Balow a question about cement hardening time. *Id.* The doctor did not mention any issue with the balloon to Mr. Balow during that call. *Id.*

Medtronic's applicable policies require the person assigned to an account to gather information about a defective product incident and report it to the company within 48 hours after they become aware that there may be a possible defect. Neither Ndoka nor Balow reported the incident to Medtronic within 48 hours of the surgery, but at that time, neither of them knew what had occurred.

Two weeks after the procedure, on April 14, 2023, a hospital representative contacted Medtronic to inform the company about the issue with the balloon. Hahn Decl., Ex. P at 3. The representative sent an email to Kellam Terry, a Senior Surgical Representative for Medtronic. Mr. Terry responded to the email, copying Mr. Balow, informing the customer that Balow was the representative for that account, and sharing Mr. Balow's phone number. *Id.* at 2–3.

Mr. Balow did not immediately respond to the hospital representative after he was copied on Terry's email to the customer. The customer reached out to Mr. Balow again on

May 7, 2023, Fitzke Decl., Ex. 17 at 3, but Mr. Balow did not respond to that message either. On May 31, 2023, the hospital representative reached out to Mr. Balow again over email, asking him to get in touch and to pick up the balloon. *Id.* And again Mr. Balow did not respond to that message.

On June 6, 2023, a manager with the customer reached out to another Medtronic employee, Tyler Futrell, and explained that the customer had not received a response from Mr. Balow. Hahn Decl., Ex. P at 1. Mr. Futrell sent out an email the following day to several Medtronic personnel, including Mr. Balow. *Id.* On the morning of June 7, 2023, Mr. Balow called the hospital representative. Balow Dep. 227:14–228:4. Mr. Balow also sent an email to tell other Medtronic personnel that he had contacted the customer and was working to resolve the issue. Fitzke Decl., Ex. 18 at 1.

After Balow called the customer on June 7, 2023, the customer sent him a product defect report and asked if he would be picking up the balloon or would send a shipping label so the item could be mailed to Medtronic. Fitzke Decl., Ex. 17 at 1–2. Later that afternoon, Mr. Balow forwarded the customer's original email from April 14th to his manager, Paul Hurley. Balow asked Hurley to tell him what he should do in response to the message and noted that the customer still had the balloon. Hahn Decl., Ex. Q.[5]

Although Mr. Balow reached out to Hurley, he did not respond to the customer's June 7th email. The customer reached out to Mr. Balow again on June 20, 2023 to ask

---

[5] Hurley says that he called Mr. Balow right away to discuss the matter, Hahn Decl., Ex. 3, Hurley Dep. 96:17–97:13, but Mr. Balow testified that Hurley never responded to the email, Balow Dep. 228:11–15.

whether Balow would pick up the defective product. *Id.* at 1. Mr. Balow did not respond to that message, and the hospital representative reached out to other Medtronic personnel on June 23, 2023. The customer said that she couldn't get a response from Mr. Balow and wanted to escalate the issue to a manager. Hagel Decl. ¶ 24.

In response to the June 23rd email, Mr. Hurley texted Mr. Balow and told him to contact the customer right away and arrange to pick up the product. Hagel Decl., Ex. 12 at 2. Mr. Balow responded to Hurley's text message indicating that he would call the customer the following day because he was out of town. He also commented: "Total BS. Lauren [Ndoka] was at this case." *Id.* Mr. Balow believed that Ms. Ndoka should have responded to the customer and been responsible for picking up the balloon because she was present at the procedure. Balow Dep. 233:8–12, 234:23–235:12. He ultimately picked up the product on July 6, 2023. Balow Dep. 228:5–10.

## VI.    Medtronic's Investigation and Balow's Termination

Medtronic's Employee Relations Specialist, Leah Kirk, initiated an investigation in response to the issue with the balloon and the customer's complaint about Mr. Balow's lack of responsiveness. The investigation also considered whether Mr. Balow violated Medtronic's CHP by failing to report the incident within 48 hours of becoming aware of it. Balow Dep. 237:17–20; Hahn Decl., Ex. Y. Kirk reviewed emails and text messages relevant to the incident and interviewed Mr. Balow and Ms. Ndoka. Hahn Decl., Ex. Y.

On July 19, 2023, Kirk sent a meeting request to Balow to set up an interview to discuss the issue. Hahn Decl., Ex. R at 3. Ms. Kirk spoke to Mr. Balow on the phone the following day. *Id.* at 4; Balow Dep. 238:21–22. Mr. Balow told Ms. Kirk that he felt it

should not have been his responsibility to respond to the customer or pick up the product because Ms. Ndoka had covered the procedure. Fitzke Decl., Ex. 11. However, Mr. Balow confirmed with Ms. Ndoka that after the procedure was completed, she did not know about the balloon rupture. *Id.* Mr. Balow shared that on the date of the procedure, he received a call from the physician because there was no Medtronic rep available during the last portion of the procedure, and the physician did not mention any issue with the balloon during that call. *Id.*

During Kirk's interview with Ms. Ndoka, Ndoka explained that she and Mr. Balow did not have the best working relationship, which Ndoka believed was caused by her limited ability to cover certain cases due to her non-compete agreement. Fitzke Decl., Ex. 11 at 3. Ms. Ndoka confirmed that she was never made aware of any product complaint from the customer or anyone else and she believed that the case went smoothly based on everything she knew. *Id.*

Mr. Balow sent Kirk a timeline of the events leading up to the surgery, the communications that followed, how he ultimately picked up the product, and his interview with Kirk. Hahn Decl., Ex. R at 2–4. The timeline Mr. Balow provided is largely consistent with the phone conversation he had with Ms. Kirk. Balow Dep. 238:20–239:24. Mr. Balow confirmed that he received several messages from the customer between April 14, 2023 and June 6, 2023 concerning the balloon, that he did not speak to the customer about the issue until after the June 6th message, and did not pick up the balloon until July 6, 2023. Hahn Decl., Ex. R at 2–4; Balow Dep. 242:7–12; Fitzle Decl., Ex. 11. After Mr. Balow

sent the timeline, on August 2, 2023, Ms. Kirk sent Mr. Balow a copy of Medtronic's policy for reporting any defective product issues. Hahn Decl., Ex. R at 1.

Following her investigation, Ms. Kirk determined that Balow did not respond to the customer in a timely way and failed to report the customer complaint within the time required by Medtronic's CHP. Fitzke Decl., Ex. 11 at 4. She explained that "[e]mails and interviews validate that [Mr. Balow] never responded to the customer via email and did not report the complaint within 48 hours of becoming aware of it." *Id.*

Mr. Balow believes that Ms. Kirk's investigation was flawed for several reasons. He asserts that Ms. Kirk did not ask him follow-up questions about the circumstances of the ruptured balloon incident or his receipt of and response to the customer's emails. He also complains that Ms. Kirk did not interview the other eight Medtronic employees who received emails from the customer about the balloon rupture and the efforts to have it picked up by someone at Medtronic. He also claims that the result of the investigation was pre-determined based on the date reflected on the draft of the findings.

Following Ms. Kirk's investigation, Mr. McLeod held another DAR meeting with members of Medtronic's employee relations, human resources, and legal departments. McLeod Dep. 100:22–101:5. Ms. Kirk presented her investigation findings to the group, discussed the circumstances that led to the investigation, reminded the review team about the fact that Mr. Balow was on a final written warning, and reminded them about the circumstances that led to the final written warning. *Id.* 103:12–104:8. The review team discussed the matter and based its decision on Mr. Balow's failure to comply with Medtronic's CHP, his repeated failure to respond to the customer, and the fact that he was

on a final written warning when this occurred. *Id.* 106:7–25. The team unanimously agreed Mr. Balow's employment should be terminated. *Id.* 103:25–106:5. Mr. McLeod made the ultimate decision to terminate Mr. Balow, and he communicated that decision to Mr. Balow on August 2, 2023. McLeod Dep. 171:21–172:4; Hahn Decl., Ex. Z at 3.

Medtronic has stated that it "is not aware of anyone within its Neuromodulation Division who engaged in conduct similar to that which resulted in [Mr. Balow's] termination." Hahn Decl., Ex. Z at 6. However, according to Mr. Balow, CHP violations happen routinely and Medtronic does not subject employees who fail to comply with any discipline. Specifically, he testified that in his experience balloon ruptures very common Balow Dep. 223:2–225:23.

After Medtronic terminated his employment, Mr. Balow amended his complaint to add a claim that the decision to fire him constituted unlawful retaliation in violation of the VWPA.[6] Medtronic filed its motion for summary judgment, the matter was fully briefed, and the Court held a hearing and took the matter under advisement on October 10, 2024.

## DISCUSSION

Medtronic argues that it is entitled to summary judgment on each of Mr. Balow's claims. Medtronic contends that the VHRA age and sex discrimination claims are untimely

---

[6] United States Magistrate Judge Elizabeth Cowan Wright denied Mr. Balow's request to further amend his complaint after the deadline for doing so in the scheduling order. Mr. Balow sought to add three new retaliatory discharge claims under the Virginia Fraud Against Taxpayers Act, the False Claims Act, and the Virginia Human Rights Act, but Judge Wright found that Balow failed to show good cause to allow the untimely amendment because all of the information on which he based those proposed claims had been available to him prior to the expiration of the deadline. Hr.'g Tr. 25:23–32:9 (Doc. 119). This Court affirmed that decision over Mr. Balow's objections. (Doc. 135).

and otherwise fail on their merits. In addition, Medtronic argues that some of Mr. Balow's retaliation claims fail because he cannot prove he engaged in protected conduct under the VWPA, and all the retaliation claims fail on their merits. As explained below, the Court concludes that none of Balow's claims survive summary judgment.

## I.    Legal Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199 (8th Cir. 2021). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge. . . ." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

## II.    Age and Sex Discrimination Claims

Medtronic asks the Court to enter summary judgment in its favor and dismiss Mr. Balow's age and sex discrimination claims under the VHRA. These discrimination claims focus on Medtronic's decision to promote Ms. Pan to ITC2 and adjust the commission allotments in the relevant territory, decreasing the commissions previously allotted to Mr. Balow. Pl.'s Opp'n 51 n.2; *see also* Am. Compl. ¶¶ 96–97, 106–07. The Court finds there is no genuine dispute of material fact and Medtronic is entitled to judgment as a matter of law on these claims.[7]

### A.  Unlawful Discrimination Under the VHRA

The VHRA makes "[i]t an unlawful discriminatory practice for an employer to discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's sex, gender identity,

---

[7] In addition to challenging the merits, Medtronic asserts that Mr. Balow's discrimination claims are untimely. Medtronic argues that Balow filed his Charge with the Virginia Attorney General's Office of Civil Rights more than 300 days after Medtronic altered the commission split between Balow and Pan. The VHRA requires the charge to be filed within 300 days of the unlawful employment practice. *See* Va. Code Ann. § 2.2-3907(A) (requiring a charge to be "filed with the Office no later than 300 days from the day upon which the alleged discriminatory practice occurred"). Medtronic argues that the VHRA's timeliness requirement should be construed consistent with the interpretation, in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007), of a similar statutory deadline for filing a charge of compensation discrimination under Title VII reflected. Mr. Balow argues that the VHRA's deadline should instead be read consistently with the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3)(A), which rendered the *Ledbetter* decision obsolete. Ultimately, the Court declines to address this issue because there is no controlling decision from the Virginia Supreme Court, and Mr. Balow's claims of unlawful age and sex discrimination fail on their merits.

[or] age." Va. Code Ann. § 2.2-3905(B)(1)(a) (cleaned up); *Peterson v. Black Body Corp.*, No. 3:23-cv-00034, 2024 WL 3272548, at *9 (W.D. Va. June 28, 2024). Under the VHRA, a plaintiff must show that an employer engaged in intentional discrimination and can do so under the familiar *McDonnell Douglas*[8] burden-shifting framework applicable to Title VII discrimination claims. *See Saville v. Nw. Reg'l Jail Auth.*, No. 5:22-cv-057, 2024 WL 2925754, at *6 (W.D. Va. June 10, 2024); *see also Laird v. Fairfax Cnty., Va.*, 978 F.3d 887, 892 n.4 (4th Cir. 2020). Using this approach, a plaintiff must "put forward evidence 'to develop an inferential case of discriminatory intent.'" *Saville*, 2024 WL 2925754, at *6 (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019)); *see also Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021) (requiring a plaintiff to show that discrimination based on membership in a protected class "was the real reason" for the adverse employment action). To establish a prima facie case of discrimination under the VHRA, a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *Washington v. Offender Aid and Restoration of Charlottesville-Albermarle, Inc.*, 677 F. Supp. 3d 383, 396 (W.D. Va. 2023) (same).

If a plaintiff provides evidence sufficient to support a prima facie case, then the employer must provide "evidence of 'nondiscriminatory explanation for its action.'" *Saville*, 2024 WL 2925754, at *7 (quoting *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

643, 650 (4th Cir. 2021)). If the employer does so, then "the burden shifts back to the plaintiff to show that the employer's explanation was actually a pretext for discrimination." *Id.* (quoting *Sempowich*, 19 F.4th at 650) (internal quotations omitted).

## B. Analysis

Assuming without deciding that Mr. Balow has provided enough to show a prima facie case of age or sex discrimination, the Court finds that Medtronic has adequately demonstrated it had a legitimate, non-discriminatory reason for adjusting the commission arrangement between Balow and Pan. Balow has failed to identify evidence from which a reasonable jury could find Medtronic's stated reason was pretext for discrimination.

In fact, there is no dispute that Medtronic presented evidence of its legitimate, non-discriminatory business reasons for promoting Ms. Pan to ITC2 and adjusting the commissions available to her and Balow. Medtronic has shown that it routinely adjusts the allocation of territories and the available commissions between its ITC2 sales personnel. There is undisputed evidence that Medtronic does this to help develop its sales representatives' skills, provide them with broader experience, grow the company's market share, provide coverage for an entire territory, and incentivize its personnel to develop Medtronic's business. In the case of Ms. Pan, her promotion to ITC2 came after her managers believed that her work as an ITC1 helped Medtronic's business in the relevant territory. Mr. Balow makes no argument that Medtronic's evidence on this issue fails to meet its burden at the summary judgment stage, and the Court finds that Medtronic has adequately shown it had legitimate, non-discriminatory reasons for the adjusted allotment of Balow's available commissions following Pan's promotion.

To show pretext, a plaintiff must provide evidence allowing a reasonable jury to infer "that his employer's proffered reasons are not worthy of belief," or "evidence that discrimination was, in fact, the employer's real reason." *Odom v. Int'l Paper Co.*, 652 F. Supp. 2d 671, 691 (E.D. Va. 2009); *Cham v. Mayo Clinic*, No. 0:23-cv-01156 (SRN/DTS), 2024 WL 3760269, at *9 (D. Minn. Aug. 9, 2024) ("To prove pretext, a plaintiff must (1) demonstrate that the defendant's state reasons for adverse action are unworthy of credence; or (2) persuade the court that a prohibited reason more likely motivated the adverse action than the proffered reason.") (cleaned up). Mr. Balow has failed to provide any evidence that would allow him to prevail at trial on the issue of pretext.

Mr. Balow argues that a reasonable jury could find in his favor because: (1) Medtronic claims that it always anticipated Pan would be promoted out of her role to ITC2, but when Balow spoke to Harrison about Pan's performance, Harrison never mentioned the possibility of a promotion, and Balow received no notice that Pan would be promoted before it happened; (2) Balow testified that he had never seen nor heard of an ITC1 being promoted to ITC2 in all his years working for Medtronic; and (3) Radena Salmon made the promotion decision, rather than a direct supervisor, deviating from Medtronic's usual procedure and showing blatant favoritism to Pan, a female, over Balow. Pl.'s Opp'n 63–64. In addition, Balow argues that Matt Amberg's comments—asking about retirement planning, Balow's wife's business, and the "back nine" comment—during his January 2022 performance review supports an inference that the real reason Medtronic altered the commission allotments was age discrimination.

None of these arguments is persuasive, and the evidence does not reasonably suggest that a prohibited reason more likely motivated Medtronic's decision than the nondiscriminatory reasons it provided. First, the undisputed evidence undermines Balow's suggestion of pretext. Mr. Balow admits that it was common for Medtronic to adjust coverage within a territory and correspondingly adjust commissions between ITC2 representatives within a territory. Indeed, Medtronic made several such adjustments during Balow's time with the company, including more than once altering the territory coverage and commission arrangements within Balow's region. In the face of Balow's own admission and the evidence showing that the action Medtronic took was common, his arguments to the contrary illustrate little more than his own disagreement with Medtronic's "business judgment." *See Odom*, 652 F. Fupp. 2d at 691; *Cham*, 2024 WL 3760269, at *9 (explaining that courts are not "super-personnel department[s] that reexamine[] an entity's business decisions").

Second, Mr. Balow's complaint that he did not receive advance notice of Pan's promotion does not show that Medtronic's stated reasons are "unworthy of credence." *Cham*, 2024 WL 3760269, at *9. The asserted lack of advanced notice is immaterial. It is difficult to see how a reasonable jury could infer that Medtronic's proffered reasons for promoting Pan and adjusting commissions were really a pretext for discrimination because Mr. Balow was not told ahead of time. Not telling Balow about what the company might do with Pan's career development or the allotment of commissions does nothing to call Medtronic's legitimate, non-discriminatory rationale into question. The alleged lack of

communication does not suggest that Medtronic favored Pan because she is female and younger than Balow.[9]

Krista Harrison's alleged promise to Mr. Balow that he would retain the accounts he helped develop while he was the lone ITC2 within the relevant territory is also immaterial to the question of pretext. Mr. Balow points to no evidence even hinting that anyone else at Medtronic was aware that Harrison made such a statement, nor to evidence that she had the actual or apparent authority to bind the company to a permanent arrangement inconsistent with how Medtronic had managed the territory in the past. Taking the evidence on this point in Mr. Balow's favor, at most, suggests that Balow's direct supervisor made a promise that the company did not keep. But that does not imply that Medtronic made the changes to the commission structure because Mr. Balow is male and older than Pan.

Third, while it is true there is a genuine dispute, for purposes of summary judgment, concerning which manager made the decision to promote Pan to ITC2, the Court finds no support for Balow's discrimination claims in that disagreement, making it immaterial. Amberg testified he made the promotion decision, and Mr. Balow testified that Amberg told him it was Radeena Salmon's determination. Of course, a jury could believe Balow's

---

[9] Mr. Balow also states that he first learned of Pan's promotion from Pan herself in a "strange" conversation that took place just before a scheduled meeting between Balow and Amberg. He asserts that Pan did not "extend an olive branch" during this conversation, but "declared her promotion while musing about how she may ultimately abandon the promotion in favor of" a different position within Medtronic. Balow Opp'n 17. It is unclear why one employee owes another an "olive branch" in connection with her promotion, and in any event, the Court finds these details immaterial to any of Mr. Balow's claims.

testimony about what Amberg told him and conclude that Salmon made the decision to promote Pan. And a jury could believe the other evidence offered by Balow suggesting that Salmon supported Pan and that Pan believed she had an ally in Salmon. But even taking all this evidence in the light most favorable to Mr. Balow, it does not discredit Medtronic's stated reasons for making the challenged decision. These circumstances simply do not permit a reasonable inference that the real reason Medtronic took the steps it did to promote Pan and adjust commissions because of Balow's age or sex. *Main v. Ozark Health, Inc.*, 959 F.3d 319, 327 (8th Cir. 2020).

Mr. Balow suggests that a jury could reasonably infer that Medtronic really reduced his allotment of commissions because he is male, and Pan is not. However, this implies that any time a senior female manager supports a junior female employee's career advancement and decides to promote her, it would be reasonable for a jury to infer intentional discrimination against a male employee based on his sex. Aside from the barely concealed contempt reflected in this argument, Mr. Balow identifies no case supporting such a proposition, and the Court is aware of none. *See Main*, 959 F.3d at 327 (explaining that the fact the plaintiff's "successor is male and twenty-two years younger than her cannot, by itself, create an inference that [she] was terminated based on her sex and age" and citing consistent cases from other courts); *see also Shaw v. Pittsburgh Bd. of Public Educ.,* No. 07–1183, 2009 WL 86709, at *5 (W.D. Pa. Jan. 12, 2009) ("[T]he fact that a woman received a more desirable assignment instead of a man does not, alone, establish gender discrimination."). Plaintiff points to no evidence in the record indicating that his sex played any role in Medtronic's decision.

Finally, the Court turns to the evidence in the record that Mr. Balow argues implies his age was a basis for Medtronic's employment decision—the comments made by Amberg during his January 2022 performance review. Mr. Balow suggests that Amberg's questions about how long he planned to continue working as a Medtronic sales representative and how his wife's business was doing would allow a reasonable jury to infer that Balow's age was the real reason that Medtronic promoted Pan and made changes to the commissions in the territory. But nothing in the record connects these comments to an impermissible motive for Medtronic's choice of how to cover the territory, and inquiring about an employee's retirement planning is not automatically indicative of unlawful discrimination. *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1137 (8th Cir. 2006) (noting that "reasonable inquiries into an employee's retirement plans do not permit an inference of [age] discrimination"). Mr. Balow offers little more than speculation that these comments were related, in any way, to the challenged employment practice. As such, at most they constitute stray remarks, rather than discriminatory hostility that was a part of the decision-making process. *See Carlson v. BNSF Rwy. Co.*, No. 19-cv-1232 (WMW/HB), 2022 WL 37468, at *5 (D. Minn. Jan. 4, 2022) ("Not every prejudiced remark made at work supports an inference of illegal employment discrimination. . . . Discriminatory hostility in the decision-making process or by individuals closely involved in that process are distinct from stray remarks in the workplace, statements by non-decisionmakers or statements by decisionmakers unrelated to the decision-making process.") (cleaned up).

In sum, none of the evidence Mr. Balow relies on supports a finding in his favor on the issue of pretext, and none points to a genuine dispute of material fact. Accordingly, the

Court finds that Medtronic is entitled to summary judgment on Mr. Balow's VHRA age and sex discrimination claims.

## III. Retaliation Claims

In Counts 1 and 4 of the Amended Complaint, Mr. Balow claims that Medtronic violated the VWPA, Va. Code Ann. § 40.1-27.3, by retaliating against him for (1) reporting that Pan was handling equipment in a sterile surgical environment; (2) filing this case in Hennepin County District Court; (3) filing a charge with the Virginia Office of Civil Rights; and (4) taking certain steps in pursuing this litigation. Specifically, Mr. Balow identifies the May 2022 territory split, the final written warning, and his termination as the three retaliatory actions taken by Medtronic. Medtronic argues that it is entitled to summary judgment on these claims for several reasons. In part, Medtronic argues that Mr. Balow's complaints about Pan's conduct during surgical procedures do not constitute protected activity under the VWPA. Further, Medtronic argues that Mr. Balow has failed to show that Medtronic issued him a final written warning in retaliation for the issues he raised about Pan's conduct. And finally, Medtronic contends that Balow points to no evidence suggesting that he was terminated in retaliation for filing this lawsuit, filing a charge, or attempting to pursue this litigation.

### A. The VWPA

The VWPA was enacted in 2020, and as a result, reported decisions applying its various provisions are somewhat scarce. *See Workman v. LHC Gr., Inc.*, No. 1:23-cv-0948, 2024 WL 3572305, at *3 (W.D. Va. July 29, 2024). "The [VWPA] provides that an employer shall not take retaliatory action against an employee because the employee

engaged in an activity that the VWPA protects." *Mirshahi v. Patient First Richmond Med. Grp., LLC*, No. 3:23-cv-495, 2024 WL 3823991, at *9 (E.D. Va. Aug. 13, 2024). For example, one form of conduct protected under the VWPA is when an "employee in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement authority." Va. Code Ann. § 40.1-27.3(A)(1). "To establish a claim under the VWP[A], [a plaintiff] must establish that: (1) he made a good faith report of a federal or state violation to a supervisor, (2) was discharged or disciplined by his employer, and (3) his report was the but for cause of his discharge." *Ayers v. Wal-Mart Assocs., Inc.*, No. 7:23-cv-00419, 2024 WL 4182706, at *4 (W.D. Va. Sept. 13, 2024) (alteration added, otherwise cleaned up).[10]

## B. Protected Conduct

Mr. Balow claims that Medtronic retaliated against him by adjusting his commissions and issuing the final written warning because he reported Ms. Pan's improper handling of equipment to Krista Harrison in the fall of 2021 and in the Surface Letter in May 2022. Medtronic argues that the undisputed evidence shows that when Mr. Balow complained to Ms. Harrison and wrote the Surface Letter, he referred only to Pan's alleged violations of Medtronic policies, not to any violation of federal or state law. Def.'s Mem. 27. Mr. Balow claims that through these complaints he made a good faith report to his

---

[10] In their briefing, the parties do not explicitly cite authority for the notion that VWPA retaliation claims are governed by the same *McDonnell Douglas* burden-shifting analysis discussed above. However, their briefing makes clear that they agree the framework should be used in connection with this claim—both sides disagree over whether a jury could find Medtronic's stated reasons for the relevant adverse employment actions are pretextual.

supervisors that Pan had engaged in the unlawful practice of medicine in violation of Va. Code Ann. § 54.1-2902, and Maryland Health Occupations Code Ann. § 14-601. Am. Compl. ¶¶ 81–84; Pl.'s Opp'n 47. Mr. Balow also suggests that his complaints presented a concern to Medtronic that one of its employees was engaging in conduct that violated federal anti-kickback law. Pl.'s Opp'n 47–48. Thus, the issue before the Court is whether there is evidence in the record from which a reasonable jury could conclude that Mr. Balow was reporting a violation of state or federal law to his supervisors.

"When a complaint of alleged discrimination is self-evidently a complaint about a violation of federal law, a plaintiff does not need to specifically identify some specific violation of law to state a claim under the VWPL." *Ayers*, 2024 WL 4182706, at *4 (quoting *Hairston v. Nilit Am., Inc.*, No. 4:23-cv-00011, 2023 WL 5447370, at *6 n.6 (W.D. Va. Aug. 24, 2023)) (cleaned up). For example, an employee's complaints about workplace discrimination by the employer generally constitute protected activity. *See Hairston*, 2023 WL 5447370, at *5. One court has found that a plaintiff adequately alleged she engaged in protected conduct when she complained to her supervisors about "disparate treatment on the basis of race" on two separate occasions. *Id.* at *6 n.6 (finding that the plaintiff adequately alleged a violation of federal or state law by complaining of racial discrimination, which "plainly violates the provisions of Title VII"). Nevertheless, some courts have also said that "a report must be rooted in specific violations of law" to constitute protected conduct under this provision. *Workman*, 2024 WL 3572305, at *4. Thus, courts have found that plaintiffs failed to plausibly allege that they made a protected report of a violation of state or federal law simply by stating that their employers engaged in

31

"misconduct," "unethical practices," or "unlawful, and unethical practices." *Id.* (discussing *Colquitt v. Bon Secour Mercy Health*, No. 4:21-cv-053, 2022 WL 479093, at *5 (E.D. Va. Feb. 16, 2022), and citing *Petersen v. DC Mech., LLC*, No. 1:22-cv-784, 2022 WL 22695554, at *4 (E.D. Va. Aug. 24, 2022)). One Virginia court dismissed a complaint for failure to state a claim where the plaintiff alleged that he raised concerns on several occasions that his employer failed to follow the Center for Disease Control guidance and Virginia state requirements concerning protections for employees in the workplace during the COVID-19 pandemic. *Chenault v. RBI Corp.*, 108 Va. Cir. 529, 2021 WL 8776245, at *2 (Va. Cir. Ct. Oct. 22, 2021) (unpublished). The court found that the employee's allegations of "voicing concerns" and "objecting to a cavalier attitude" were "simply not enough to support a claim that Plaintiff in good faith reported a violation to a supervisor." *Id.*

These cases demonstrate that the VWPA does not require the employee to provide a specific citation to a federal or state law he claims has been violated for a report to be protected activity, but the employee must somehow indicate a violation of law. *Workman*, 2024 WL 3572305, at *4 ("[A] plaintiff must plausibly link the reported misconduct to violations of law."). Unfortunately for Mr. Balow, the substance of his complaints to Ms. Harrison and in the Surface Letter do not reference any purported violation of federal or state law or otherwise specify a concern that clearly placed Pan's alleged misconduct within the scope of the VWPA. It is undisputed that neither the Harrison report, nor the Surface Letter mentioned the Virginia or Maryland statutes cited in Mr. Balow's Amended Complaint or the other provisions of law that he referenced in his opposition brief. But

Mr. Balow did specifically refer to a violation of Medtronic policy. There is no evidence that Mr. Balow mentioned the phrase "unauthorized practice of medicine," nor that he had a specific concern about violations of federal or state anti-kickback laws based on comments he heard from physicians regarding Pan's conduct. There is simply no evidence in the record to support Mr. Balow's claim that he was reporting a violation of federal or state law. As a result, Medtronic is entitled to summary judgment on these retaliation claims.

Mr. Balow also suggests that his complaint in the Surface Letter constitutes protected activity because he reported age and sex discrimination when he complained about the changes to his allotment of commissions after Pan was promoted. However, the Court finds that the evidence does not support his argument. The Surface Letter simply did not raise the issue of alleged discrimination on the basis of age or sex—had it, that may have made Mr. Balow's report resemble, at least in part, the kind of complaint about discrimination found sufficient in *Hairston*. *See* 2023 WL 5447370, at *5–6 & n.6. Instead, Mr. Balow complained only that the changes to his allotment of commissions had been "unfair." Based on the relevant case law applying the VWPA, such a report of an "unfair" compensation decision by an employer is not conduct protected by the statute because it does not constitute a good faith report of a federal or state violation. *See Isernia v. Danville Regional Med. Ctr., LLC*, No. 4:22-cv-00022, 2024 WL 4697681, at *12 (W.D. Va. Nov. 6, 2024) (dismissing VWPA claim for failure to state a claim where physician plaintiff's complaint alleged only reports of concerns regarding "staffing levels or record keeping"

and finding citations to provisions of state and federal law in an opposition brief were insufficient).

Accordingly, Medtronic is entitled to summary judgment on Mr. Balow's claims that Medtronic violated the VWPA by splitting his commissions or issuing him a final written warning in retaliation for his reports to Ms. Harrison and in the Surface Letter.[11]

## C. Final Written Warning

Medtronic next argues that even if Mr. Balow engaged in protected activity, it is still entitled to summary judgment because he points to no evidence indicating the commission split or final written warning was retaliatory. The Court agrees. Mr. Balow has not identified evidence of a causal connection between his reports and Medtronic's adverse actions.

Start with Mr. Balow's claims that Medtronic adjusted his commissions and issued the final written warning because of his report to Ms. Harrison in the fall of 2021. *See* Am. Compl. ¶ 85. The Court concludes that a reasonable jury could not find the required causal

---

[11] In his opposition brief, Mr. Balow argues that he engaged in conduct protected by the VWPA on September 16, 2022, and again on October 12, 2022 because his attorney sent communications to Medtronic in which he made more direct reports of retaliation and discrimination. Pl.'s Opp'n 48–49. Because these communications post-dated the changes to Balow's allotment of commissions in January and May 2022, they could not form the basis of any claim that Medtronic retaliated for protected activity by adjusting his territory and his compensation. These later communications do contain sufficient accusations of conduct that would violate state and federal employment discrimination laws. But, the Court notes that nowhere in the September 18, 2023 Amended Complaint does Mr. Balow mention either report from his counsel as forming part of a retaliation claim. Of course, a plaintiff cannot amend his complaint or raise a new theory or claim in response to a defendant's motion for summary judgment. *McDonald v. City of St. Paul*, 679 F.3d 698, 708 n.8 (8th Cir. 2012) ("The district court also correctly declined to consider [plaintiff's] unpleaded allegations . . ., which were not raised until his opposition to defendants' motion for summary judgment.").

connection to support Balow's retaliation claims in this context. As noted, after Mr. Balow made the report to Harrison, Harrison told Balow to report his concerns to Amberg because she was no longer his supervisor. Mr. Balow admits he did not then share his concerns with Amberg. Mr. Balow's only suggestion that Harrison relayed his report about Pan's actions to anyone else at the company is his testimony that Victor Watkins said "I know Matt [Amberg] knows what Angela was doing because Krista [Harrison] told me that she told [Amberg] before she left the company." Balow Dep. 91:23–92:3. Balow's testimony about what Watkins said Harrison told him is inadmissible hearsay. *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1112 (8th Cir. 2005) ("[D]eposition testimony must also be admissible to be considered in ruling on a motion for summary judgment."). There is no deposition testimony, affidavit, or declaration from Watkins himself about this topic. As a result, there is no evidence that anyone involved in the decision to change Mr. Balow's commissions or issue the final written warning had any knowledge of his report to Harrison.

Moreover, the timing of the report to Harrison and subsequent allegedly retaliatory actions by Medtronic undermines any inference of a causal connection. Medtronic first adjusted the commissions available to Mr. Balow in January 2022 to a 70/30 split, several months after the Harrison report in the fall of 2021. The even split of commissions in May 2022 is even farther removed from the Harrison report, and the November 2022 final written warning is nearly a year later. This is not the kind of "very close" temporal proximity that supports an inference of causation. *See Lightner v. Catalent CTS (Kansas City), LLC*, 89 F.4th 648, 656 (8th Cir. 2023) (explaining that "temporal evidence should generally be corroborated by other evidence of employment discrimination" but "when the

temporal proximity is very close, [it] alone may be sufficient to create an inference of the causal link"). And just as there was no evidence suggesting that the real reason Medtronic adjusted Balow's commissions was age or sex discrimination, there is no evidence that Medtronic's stated reasons for making changes to the commissions were pretext for retaliation. *See Scarborough v. Federated Mutual Ins. Co.*, 996 F.3d 499, 506 (8th Cir. 2021) (noting that "the plaintiff shoulders the ultimate burden of establishing a whistleblower violation by demonstrating that the employer's reason is merely a pretext and that retaliatory animus motivated the adverse action") (quoting *Pedersen v. Bio-Medical Applications of Minn.*, 775 F.3d 1049, 1055 (8th Cir. 2015)). In sum, Mr. Balow points to no evidence indicating that his report to Harrison was the cause of the adjustment of commissions.

Turn next to the Surface Letter, and the Court's conclusion is the same: Mr. Balow has failed to present evidence that would allow a reasonable jury to find that his report of either Pan's conduct or his complaint of an "unfair" compensation decision was a but for cause for Medtronic placing him on a final written warning.[12] Medtronic presented evidence of legitimate, non-retaliatory reasons why it placed Mr. Balow on the final warning. The evidence shows that following an inquiry into the complaints Ms. Pan made about Mr. Balow's conduct, the investigator determined that Balow engaged in some of the conduct reported by Ms. Pan. A DAR team met to discuss the investigation's findings and

---

[12] Because Mr. Balow did not share the Surface Letter with Medtronic until May 16, 2022, it could not have been the cause of the commission adjustments, which occurred in January 2022 and earlier in May 2022.

concluded that Mr. Balow should receive discipline because certain of his conduct violated Medtronic employment policies. Specifically, Medtronic has shown that it placed Mr. Balow on a final warning because (1) he sent inappropriate text messages to Ms. Pan implying that doctors wanted to work with her because they found her attractive or wanted to pursue her romantically, and (2) he pushed off some of his workload onto Ms. Pan and some doctors decided they did not want to work with him, leaving Pan to cover more than her fair share of the territory.

Although Mr. Balow criticizes the nature of the investigation into Pan's complaints, he offers nothing more than speculation to suggest that the investigation was a sham. Such a characterization of the investigation is even less compelling given that Ms. Jones seriously considered and rejected so many of Pan's complaints about Balow. Indeed, all the evidence suggests that Medtronic issued the final warning to Balow because it had a "good faith belief that [he] engaged in misconduct," and as a result, Medtronic "acted because of perceived misconduct, not because of protected . . . activity." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 416 (8th Cir. 2010).

In response to Medtronic's evidence of its rationale for the final warning, Mr. Balow has not shown that Medtronic's stated reason "is merely a pretext and that retaliatory animus motivated the adverse action." *Scarborough*, 996 F.3d at 506. None of Mr. Balow's arguments for why a jury should decide the issues of pretext and causation are persuasive.

First, Mr. Balow does not really argue that a jury could find Medtronic had no factual basis for concluding that he pushed off his own work to Ms. Pan and that certain doctors had refused to work with him. Exactly what, if anything, he has to say about this

stated reason for the final written warning is unclear. However, it appears that he argues this reason is unworthy of credence because Pan's entire motive in making her complaints was to retaliate against him for the Surface Letter. The Court addresses that broad criticism below.

Second, Mr. Balow argues that there is "potent" evidence of temporal proximity between his protected activity and the final written warning because the discipline came immediately on the heels of his attorney sending a draft state court complaint to Medtronic on October 12, 2022. Pl.'s Opp'n 52. He also argues that the timing of the discipline is "suspicious" and indicative of pretext because Jones finished her investigation in September, but the final written warning was not issued until November 16, 2022. *Id.* at 52–53. Setting aside the fact that Mr. Balow did not allege that the October 12 communication constituted protected activity, Mr. Balow offers nothing other than speculation that the final written warning motivated by retaliatory animus. *Id.* at 53 (stating that "perhaps there was an intervening event" between completion of Jones' investigation and the final written warning—"Balow's draft complaint"). That speculation is not enough to get to a jury. The evidence shows that Jones conducted a thorough investigation, found many of Pan's complaints lacked sufficient support, and reached a determination that three of her complaints were substantiated. Based on the investigative findings, the DAR team, and ultimately McLeod, concluded that Balow had violated company policy and should be subject to discipline.

Third, Mr. Balow suggests that an inference of pretext can be inferred because "Medtronic uses progressive discipline" and deviated from its disciplinary policy by

jumping to a final written warning. Pl.'s Opp'n 53. Mr. Balow notes that Medtronic's Global Discipline Policy discusses the use of progressive discipline as an option where misconduct allegations have been found substantiated, but he concedes that the policy does not require Medtronic to use progressive discipline. Hahn Decl., Ex. V at 4 ("discipline does not require following a progressive discipline process").[13] Mr. Balow points to no evidence in the record to support his suggestion that Medtronic always uses a progressive discipline approach. The undisputed evidence in the record instead shows that Medtronic determines appropriate discipline based on what has transpired. Hagel Dep. 25:6–26:10. And even if there were less serious steps Medtronic could have taken, there were also more serious ones, including termination. Indeed, the record suggests that Ms. Pan was subjected to termination rather than any graduated sanction.

Fourth, Mr. Balow suggests that McLeod, who made the ultimate decision to issue the final written warning, could not "explain why the text messages were inappropriate" and admitted he did not review the messages. Pl.'s Opp'n 53. Further, Balow contends that the investigative report did not even make the text messages available to McLeod or other members of the DAR team. *Id.* Regarding the availability of the text messages, Mr. Balow is simply incorrect. The full text messages were linked in the electronic document

---

[13] Mr. Balow cites *Morris v. City of Chillicothe*, 512 F.3d 1013, 1020 (8th Cir. 2008) in support of his progressive discipline argument, but his partial quote to *Morris* elides the discussion that is unhelpful to his case. *Morris* makes clear that "[d]eviation from a progressive discipline policy can be evidence of pretext, but here, the department's employee manual and related documents specifically state that the department is not bound by any number of warnings and that it can fire at-will employees without warning if necessary. We have found such caveats in an employee policy negate its persuasiveness in showing pretext." *Id.*

comprising investigator Jones's report. Supplemental Fitzke Decl. (Doc. 148); Hagel Decl., Ex. 8 at 5 (showing link to "Additional Supporting Documentation"). Mr. Balow also mischaracterizes McLeod's testimony regarding the rationale for issuing the final warning based on Balow's messages to Pan. McLeod testified consistently and clearly that the context of Pan's complaint regarding Mr. Balow's conduct and the nature of Mr. Balow's comments in the messages formed pieces of a puzzle that led to the conclusion that Balow violated company policy. McLeod Dep. 110:19–115:12. And the disciplinary review team plainly relied on Ms. Jones' report in determining the appropriate discipline to impose for Mr. Balow's conduct in sending the text messages and passing work off to Pan.

Fifth, Balow argues that "the Final Written Warning is wholly unworthy of credence" because the "texts [Balow sent were] on their face were benign." Pl.'s Opp'n 53–54. But this self-serving characterization of Balow's own messages does not show that Medtronic's rationale for its disciplinary decision "has no basis in fact," and he has failed to "raise genuine doubt as to the legitimacy of [Medtronic's] motive." *Hairston v. Wormuth*, 6 F.4th 834, 843 (8th Cir. 2021) (quoting *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015) and *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012)). Even taking the evidence in the light most favorable to Balow, the content of the messages themselves does not call into question whether the decision-makers made a good faith assessment when they concluded that the messages violated company policy. *See Alvarez*, 626 F.3d at 417 ("The evidence here was not so lopsided as to support a reasonable conclusion that [the employer] was acting in bad faith when it determined that [the

40

employee] committed misconduct."). Through this argument, Mr. Balow simply attempts to question Medtronic's business judgment about whether he violated company policy. *See Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1118 (8th Cir. 2018) ("[I]t is important to remember, as we have often said, that a federal court is not a super-personnel department with authority to review the wisdom or fairness of business judgments made by employers."); *see also McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 862 (8th Cir. 2009) ("The record in support of the employer's conclusion is not so sparse, or the employer's conclusion so implausible, that McCullough's challenge to the *merits* of the decision can create a genuine issue about whether the employer's *motivation* was impermissible.") (emphasis in original).

Mr. Balow also contends that Pan never expressed any concern with the text communications at issue until after he reported her violations of company policy. He suggests that Pan's interpretation of the text messages is relevant in deciding whether Medtronic's reasons for issuing the final warning were a pretext for retaliation. Finally, Mr. Balow faults Medtronic's investigation regarding the text messages because Pan was never asked why she made no complaint in response to a surgeon who sent her inappropriate text messages. Pl.'s Opp'n 54. None of this moves the needle. With respect to the inappropriate messages from the customer, Mr. Balow points to no evidence that any

of the decision-makers knew about those messages at the time of the decision to place him on a final warning. Consequently, those messages are irrelevant to the question of pretext.[14]

Finally, Mr. Balow argues that a jury could find Medtronic's stated reasons for issuing the warning are unworthy of credence because Pan's complaint about him was "retaliatory and baseless," Balow made clear that retaliation was behind her complaints, and the decision-makers knew that Balow had reported Pan's violations of company policy in the Surface Letter when they imposed the discipline. Pl.'s Opp'n 54. It is undisputed that McLeod and the other members of the DAR team knew about the Surface Letter when the decision was made to issue the final warning to Balow. Indeed, they discussed both Mr. Balow's and Ms. Pan's complaints about one another at the same review meeting. But the DAR team's awareness that Mr. Balow had engaged in conduct that constitutes protected activity is not enough on its own to suggest pretext because that rule would insulate the employee in all cases from employer discipline regardless of his own misconduct. *Cf. Alvarez*, 626 F.3d at 417 ("Filing a harassment complaint, however, does not insulate an employee from the consequences of violating company policy.").

Moreover, even if Pan made her complaints about Balow's behavior because she was upset that Balow had reported her conduct in the Surface Letter and wanted to get back at him, that does not demonstrate that Medtronic's stated reason for issuing the final written

---

[14] Balow suggests that because Pan did not complain about messages she received from the doctor and laughed them off, similar to her responses to Balow, she must not have found the messages offensive. But Pan's reaction has no obvious bearing on whether Medtronic's reasons for discipline were pretextual. A woman choosing to endure unwelcome messages from a customer for a time rather than rocking the boat does not mean the messages were acceptable.

warning was pretext for the company's retaliation. Mr. Balow does not allege that Pan somehow tricked the DAR team or McLeod into issuing the final written warning because Balow had engaged in protected conduct.[15] Pan's own alleged retaliatory motive in making her complaints would not change the reality that Medtronic's disciplinary decision had a basis in fact, with respect to both the text messages and Balow's pushing off of some of his work to Pan. As noted, Balow really only challenges the former reason, and the undisputed evidence indicates that there was a factual basis for Medtronic to conclude Balow violated company policy in both respects.

There is no dispute that Balow sent the text messages at issue to Pan. Mr. Balow admitted that when Ms. Pan complained about his text messages to Medtronic, the company had an obligation to investigate, though he maintained that there was nothing wrong with his texts. Balow Dep. 175:25–177:2. He also agreed that if an employee suggested that his coworker was getting business because doctors are attracted to the coworker, that would be a violation of company policy, though he denied his messages carried any such implication. *Id.* at 176:21–25. Under these circumstances, a reasonable jury could not conclude that Medtronic's stated reasons for imposing the final written warning was unworthy of credence or had no basis in fact.

---

[15] At the hearing, Plaintiff's counsel disavowed any reliance on a so-called "cat's paw" theory of liability. *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) ("In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.") (quoting *EEOC v. BCI Coca–Cola Bottling Co. of L.A.,* 450 F.3d 476, 484 (10th Cir. 2006)).

### D. Termination

The parties focus their disagreement about Mr. Balow's retaliatory termination claim on whether there is evidence that would allow a jury to conclude that Medtronic's stated reasons for terminating him were pretext for unlawful retaliation. Mr. Balow claims that Medtronic terminated him on August 2, 2023 in close temporal proximity to his protected activity, including sending a draft complaint on October 12, 2022 in which he alleged sex and age discrimination, filing his initial complaint in this case on March 31, 2023, filing a charge of discrimination with the Virginia Office of Civil Rights in July 2023, participating, through counsel, in a motion hearing in this case on July 6, 2023,[16] and inquiring about deposition availability of certain Medtronic witnesses on July 18, 2023. He also complains that Medtronic engaged in a rushed investigation and contends that Medtronic treated him differently from similarly situated employees who also violated the CHP. Pl.'s Opp'n 49–50, 54–62.

Having considered Mr. Balow's arguments, the Court finds Medtronic is entitled to summary judgment on his retaliatory termination claim under the VWPA. Assuming that Balow has established a prima facie case, there is no dispute that Medtronic has provided evidence of legitimate, non-retaliatory reasons for the termination decision. Mr. Balow has failed to provide evidence establishing a genuine issue for trial indicating that Medtronic's reasons for his termination are pretext for unlawful retaliation.

---

[16] This was a hearing on Mr. Balow's motion to remand his case to state court and Medtronic's motion for partial judgment on the pleadings. Mins. of Hr'g (July 6, 2023) (Doc. 40).

One of the reasons Medtronic provided for firing Mr. Balow was the fact he was on a final written warning at the time he failed to comply with the CHP and repeatedly failed to respond to a customer's inquiries following the balloon rupturing incident. Mr. Balow suggests that the existence of the final warning does not legitimately support the termination decision because the final warning itself had no basis in fact. However, as discussed, the Court finds that Mr. Balow failed to show the rationale for issuing the final written warning was unworthy of credence. Accordingly, to the extent Mr. Balow attempts to bootstrap his failed arguments about the flaws in the final written warning into his assertion that it was an improper basis for termination, the Court is not persuaded.

Another justification Medtronic provided for terminating Mr. Balow is, of course, that he violated the company's CHP because he did not report the balloon rupturing incident within 48 hours after he learned that it had occurred. Mr. Balow admitted that a customer's report of a product defect was covered by Medtronic's CHP and that he did not report the balloon rupturing incident after receiving notice of it. Balow Dep. 219:23–221:18. There is no genuine dispute that Mr. Balow's eventual report to Medtronic was untimely. Horvath Dep. 138:21–140:5. And to the extent Mr. Balow suggests that his conduct did not really violate the CHP, that alone would fail to demonstrate that Medtronic did not genuinely believe that he had. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) ("If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false.").

Despite that evidence, Mr. Balow argues that the issue of pretext should go to the jury because he was similarly situated to other employees who also failed to report balloon ruptures in accordance with the CHP, but who received no discipline. However, he presents no evidence of an appropriate comparator—he identifies no other Medtronic employee who similarly situated to him in all relevant respects who was treated differently. *See McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 600 (8th Cir. 2020) (explaining that when considering pretext, comparators must be "similarly situated in all relevant respects," including having "engaged in the same conduct without any mitigating or distinguishing circumstances") (quoting *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012)).

Balow suggests that other employees copied on the customer's April 14, 2023 email about the balloon issue also failed to comply with the CHP by failing to complete mPXR reports within 48 hours of that email, but they were not disciplined. However, Balow has not shown that any of those other individuals was the responsible Medtronic representative for the account triggering a duty to report, nor that any of them was on a final written warning at the time they received the email. Mr. Balow also points to another sales representative, K.L., who Mr. Hurley testified failed to timely file an mPXR report as required by the CHP, but who, unlike Balow, remains a Medtronic employee. Pl.'s Opp'n 58–59. Again, K.L. is not a proper comparator because Mr. Balow points to no evidence that K.L. was on a final written warning or that K.L. engaged in conduct like Mr. Balow's repeated failure to respond to a customer's communications. Thus, Mr. Balow's proffered comparator evidence does not create a genuine issue for trial as to pretext.

Medtronic also stated that it terminated Mr. Balow's employment because of his repeated failure to respond to the customer following the March 30, 2023 balloon rupturing incident. Mr. Balow's opposition largely disregards the extensive evidence in the record supporting this non-retaliatory basis for his discharge, but he argues that focusing on that aspect of the decision "strips Balow's termination of all context and asks the Court to draw all inference[s] in *Medtronic's* favor, rather than the non-movant's." Pl.'s Opp'n 50–51. The Court disagrees. The undisputed evidence shows that Mr. Balow failed to respond to the customer on at least four separate occasions, twice requiring the customer to escalate the matter within Medtronic to get a response. Mr. Balow did not respond to messages from the customer on April 14, May 7, and May 31, 2023. His first effort to respond came on June 6, 2023, after the customer reached out to others at Medtronic because Balow had not gotten back to her. Even after that, Balow again failed to respond to another message from the customer on June 20, 2023. And despite requests from his supervisor and the customer spanning months, Mr. Balow did not pick up the product until early July 2023.

Balow points to nothing in the record that calls this timeline into question. He admits that he failed to respond to the customer on several occasions. *See* Fitzke Decl., Ex. 20 (plaintiff's timeline); Balow Dep. 238:12–239:24. Even drawing all the inferences from the facts in Mr. Balow's favor, there is no issue for trial about whether Medtronic had a

basis in fact for concluding that he repeatedly failed to respond to a customer.[17] Acknowledging the conclusive evidence on this point does not misapply the summary judgment standard, and the undisputed evidence of Mr. Balow's failure to communicate with the customer negates any suggestion that Medtronic really terminated him because he engaged in activity protected under the VWPA.

Nevertheless, Mr. Balow argues that an inference of retaliatory animus is appropriate here because there is evidence of close temporal proximity between his protected conduct and his termination. Although he filed this suit in late March 2023 and his termination occurred several months later in August, he argues that the relevant dates for judging temporal proximity are closer in time. For example, he focuses on the date he filed his charge with the Virginia Office of Civil Rights, his participation through counsel in a July 6, 2023 hearing, and his counsel's request on July 20, 2023 to depose two Medtronic managers.

The Court finds that the timing of the alleged protected conduct and the termination decision would not allow a reasonable jury to find a retaliatory motive and Mr. Balow's

---

[17] Balow attempts to deflect responsibility for failing to repeatedly respond to a customer onto Ms. Ndoka and Mr. Hurley. He argues that Ms. Ndoka should have been responsible for handling the correspondence because she was at the procedure, but there is no dispute that she was not at the procedure when the balloon ruptured, and there is no evidence that Balow or any other Medtronic employee ever asked Ndoka to handle communication with the customer. He also argues that Mr. Hurley is to blame because Hurley failed to follow-up with him after Balow asked for feedback in early June on how to respond to the April 14th message he had already ignored for two months. But Hurley's response is largely irrelevant because Balow had already failed to respond to the customer on three separate occasions, requiring the customer to escalate the issue. And Balow failed to respond to another message from the customer again after Hurley's alleged lapse. Even if a jury took all reasonable inferences from these facts in the light most favorable to Balow, it could not find that Medtronic's stated reason for the termination decision was unworthy of credence.

effort to recalibrate the relevant temporal proximity is unavailing. First, although Mr. McLeod acknowledged that when he decided to terminate Balow, he was aware that Mr. Balow had earlier filed suit, Balow does not point to evidence showing that McLeod knew that after Balow filed this lawsuit, he filed a charge with the Virginia civil rights office, that there had been a motion hearing, or that his counsel asked for deposition dates.[18] *See Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 983 (8th Cir. 2022) (finding no causal link between protected activity and adverse employment action where plaintiff provided no evidence that the decision-maker "had any awareness of [plaintiff's] protected activity" at the relevant time).

Second, any inference that Balow's protected conduct caused his termination is undermined by the intervening misconduct of repeatedly failing to respond to a customer and failing to adhere to the CHP. *See Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 527 (8th Cir. 2017) ("Whatever causal inference that might have been drawn from the temporal proximity between [plaintiff's] protected activity and the termination of his employment was vitiated by the intervening . . . misconduct."); *Lockridge v. Per Mar Sec. & Research Corp.*, No. 12-cv-2894 (MJD/JJK), 2014 WL 4626355, at *11 (D. Minn. Sept. 15, 2014) (finding that plaintiff's threatening and intimidating conduct and failure to perform work constituted intervening events that "erode[d] causal connection based on temporal proximity"), *aff'd*, 603 F. App'x 522 (8th Cir. 2015).

---

[18] Although Balow suggests McLeod knew about the relevant protected activity, Pl.'s Opp'n 11–12, McLeod's testimony acknowledging that he was aware of the lawsuit, McLeod Dep. 173:21–174–14, not the subsequent activity that Balow identifies in his opposition brief to support his temporal-proximity argument.

Finally, Mr. Balow identifies nothing about the protected activity that occurred after he filed this lawsuit that significantly altered or escalated the accusations of unlawful conduct he had already made against the company in this litigation. *See Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 919–20 (8th Cir. 2014) (finding that the timing of a plaintiff's later complaint about sexual harassment on the eve of her termination did not create close temporal proximity to her termination, in part, because it "did not raise any new complaints"). When he originally filed this lawsuit, Mr. Balow accused Medtronic of unlawful age and sex discrimination, in connection with the change to his commissions, and retaliation for reporting Pan's conduct by issuing him a final written warning. Those allegations did not change when Mr. Balow filed his charge, nor did they change when his attorney appeared for a motion hearing in July 2023 or when his attorney requested deposition dates. These are routine steps in litigation unlikely to even be known outside of counsel, let alone likely to provoke retaliation. Nor are there other circumstances that might support an inference of retaliatory motive. For example, one might imagine that a plaintiff who had already initiated a lawsuit could inspire retaliatory animus in an employer by seeking to depose high-level executives unconnected to the personnel issues that are commonly at issue in employment discrimination cases. Balow does not point to any evidence suggesting that he sought such discovery from Medtronic or otherwise engaged in anything other than run-of-the-mill litigation activities. By the time Balow engaged in the post-complaint protected activity, this suit publicly accusing Medtronic of discrimination and retaliation had already been pending for several months. Given the

largely duplicative nature of the subsequent protected activity, a reasonable jury could not infer his termination was retaliatory based on temporal proximity.

For these reasons, the Court concludes that Mr. Balow has failed to show Medtronic's stated reasons for his termination were pretext for retaliation.

### ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT** Defendant's Motion for Summary Judgment (Doc. 122) is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**.

**Let Judgment be entered accordingly.**

Date: January 6, 2025                    *s/Katherine Menendez*
                                         Katherine Menendez
                                         United States District Judge